540 So.2d 444 (1989)
Kathleen Dowty JARMAN
v.
G. William JARMAN.
Nos. CA 87 1812, CA 87 1813.
Court of Appeal of Louisiana, First Circuit.
February 28, 1989.
*445 J. Minos Simon, Lafayette, for Kathleen Dowty Jarman.
Alan S. Fishbein, Baton Rouge, for George William Jarman.
Before COVINGTON, C.J., and LOTTINGER and FOIL, JJ.
FOIL, Judge.
On November 4, 1986, Mrs. Kathleen Dowty Jarman filed a petition for separation from her husband George William Jarman, alleging cruel treatment on his part and abandonment. Mr. Jarman also filed suit on November 4, seeking a separation based upon Mrs. Jarman's cruelty. Both spouses answered each other's petitions and the two actions were later consolidated on joint motion of the parties.
After a trial on the merits on May 28 and 29, 1987, the trial judge took the matter under advisement. On July 9, 1987, judgment was entered in favor of Mr. Jarman, and against Mrs. Jarman, finding her guilty of cruelty and solely at fault in the dissolution of the marriage. The trial judge further granted joint custody of the children to the parties, and ordered Mr. Jarman to pay educational, medical and insurance expenses for the children, as well as $2,000.00 per month as child support. Mrs. Jarman was granted the exclusive use of the matrimonial domicile. The trial judge ordered Mr. Jarman to pay, as alimony pendente lite, the first and second monthly mortgage payments, totaling $3,662.00, and to maintain Mrs. Jarman's medical insurance.
Mrs. Jarman appeals the separation judgment, alleging the trial court erred:
(1) In making an award of alimony pendente lite to her that failed to include any amount for her support;
(2) In finding her guilty of fault (cruel treatment); and
(3) In finding her daughter's testimony was not reliable.
We will discuss each area of complaint, in turn, below.

ALIMONY PENDENTE LITE
In her first assignment of error, Mrs. Jarman contends that, in ordering Mr. Jarman to pay the mortgage notes on the matrimonial domicile and to maintain her health insurance as alimony pendente lite, the trial judge failed to award an amount for the basic necessities of life, such as food and clothing. She further argues *446 that, as a matter of law, a trial judge may not convert a spouse's obligation to pay alimony pendente lite into a preferred obligation to pay community debts.
The applicable Civil Code provision for alimony pendente lite is Article 148, which provides:
If the spouse has not a sufficient income for maintenance pending suit for separation from bed and board or for divorce, the judge may allow the claimant spouse, whether plaintiff or defendant, a sum for that spouse's support, proportioned to the needs of the claimant spouse and the means of the other spouse.
The purpose espoused by this article is the maintenance of the spouse at a standard of living comparable to that enjoyed prior to the separation. In essence, alimony pendente lite is no more than a judicial enforcement of the spouse's support obligation. This alimony must be gauged in proportion to the needs of the claimant spouse and the means of the supporting spouse. See Hall v. Hall, 348 So.2d 707 (La.App. 1st Cir. 1977).
It is well settled that trial judges are vested with much discretion in fixing awards for alimony pendente lite. A reviewing court will not disturb such an alimony award in the absence of a clear showing of an abuse of said discretion. Hall, supra.
Payment of a community loan may be made a part of the alimony or support obligation of a spouse. See Lovell v. Lovell, 490 So.2d 330 (La.App. 1st Cir.), writ denied, 495 So.2d 302 (La.1986). In Cox v. Cox, 447 So.2d 578 (La.App. 1st Cir.1984), the trial judge ordered plaintiff to maintain the first and second mortgages on the family home and explained in oral reasons that the mortgage payment was neither alimony nor child support, but the ordered payment of a community debt. The plaintiff argued that, in so doing, the trial judge went beyond the statutory jurisdiction established for the family court. This Court disagreed, and stated:
The word alimony refers to the nourishment, lodging, and support of the person who claims it. La.C.C. art. 230. By ordering plaintiff to maintain the mortgages on the home, the trial judge was providing living accommodations for defendant and her minor child. We find that the furnishing of the family home without payment by Mrs. Cox is a part of the support for plaintiff's wife and child. The order to pay the mortgages was a means of assuring the continued availability of that family home.... The granting of the occupancy of the family home is considered in awarding alimony and child support. La.R.S. 9:308. Therefore, the fact that plaintiff has been ordered to maintain the mortgage on the family home must also be considered in meeting the wife's and child's needs. Cox, id, at 579 (Emphasis added).
We find no error in the trial judge's order that Mr. Jarman pay the monthly mortgage notes on the family home. Furthermore, these payments are certainly part of the support for Mrs. Jarman and the two children.
In written reasons, the trial judge considered in great detail the needs of Mrs. Jarman based upon her customary lifestyle and the ability of Mr. Jarman to pay support based upon his income less his expenses. However, by ordering Mr. Jarman to pay, as alimony pendente lite, the first and second monthly mortgage notes and Mrs. Jarman's medical insurance premiums, the trial court failed to include an amount, in cash, to meet other needs and expenses of Mrs. Jarman. We feel that said failure constitutes an abuse of the trial court's wide discretion in such matters. Therefore, we will award to Mrs. Jarman the additional sum of $500.00 per month alimony pendente lite. We believe this figure represents a sufficient sum to provide for Mrs. Jarman's basic necessities of life.

CRUELTY
By means of her second assignment of error, Mrs. Jarman asserts the actions of her and her husband evidenced nothing more than mutual incompatibility, fussing and bickering. Alternatively, she claims that Mr. Jarman provoked her alleged "cruel *447 treatment", which he used as grounds for obtaining the judgment of separation.
Louisiana Civil Code article 138 sets forth the grounds for separation from bed and board. It provides in pertinent part:
Separation from bed and board may be claimed reciprocally for the following causes:
. . . . .
3. On account of habitual intemperance of one of the married persons, or excesses, cruel treatment, or outrages of one of them toward the other, if such habitual intemperance, or such ill-treatment is of such a nature as to render their living together insupportable.
A finding of cruelty requires a dual analysis of the facts. First, the judge must decide whether or not the objective factual conduct, which is alleged to be cruel, actually occurred. Second, if the trial judge finds that the conduct in fact occurred, he must make a further, largely subjective, determination as to whether or not that conduct rendered the parties' living together insupportable under the terms of article 138(3). Cruse v. Cruse, 498 So.2d 1153 (La.App.3d Cir.1986).
It would serve no useful purpose to enumerate the many acts, traits, and characteristics of Mrs. Jarman that Mr. Jarman claims as "cruelty." The trial judge examined the facts as presented and concluded that Mr. Jarman met his burden of proving cruel treatment. A trial judge's findings of fact on the issue of a wife's fault will not be disturbed on appeal unless found to be manifestly erroneous. Pearce v. Pearce, 348 So.2d 75 (La.1977); Cruse, supra. The record supports the trial judge's findings in this instance. This assignment lacks merit.

CREDIBILITY
In her final assignment of error, Mrs. Jarman asserts that the trial court erred in finding her daughter's testimony unreliable. At trial, Jennifer Jarman, age 14, testified as to several confrontations or discussions which occurred between her parents. The trial judge stated in his written reasons that he could not place full reliance on her testimony as she was spying on her parents when the instances occurred, and she was not present for the entire discussions.
The trial judge's determinations on the issue of credibility in a suit for separation from bed and board should not be disturbed absent a finding of manifest error. Allemand v. Allemand, 415 So.2d 463 (La. App. 1st Cir.1982). We find no such error in this case. This assignment is without merit.

MOTION TO STRIKE/SANCTIONS
Additionally, Mr. Jarman filed a motion to strike Mrs. Jarman's appellate brief, citing the Uniform Rules of the Courts of Appeal. Mr. Jarman also requests that this Court impose sanctions in accordance with said Rules.
Rule 2-12.4 provides in pertinent part: The language used in the brief shall be... free from ... irrelevant matter.... Any violation of this Rule shall subject the author, or authors, of the brief to punishment for contempt of court, and to having such brief returned.
Mr. Jarman calls our attention to a footnote in the brief and an attached copy of a Reconventional Demand filed on Mrs. Jarman's behalf in a separate divorce action, both of which make references to adultery allegedly committed by Mr. Jarman. Mr. Jarman claims the information is irrelevant, prejudicial and immaterial to the instant appeal.
Although these references made by Mrs. Jarman may have been inappropriate, this Court does not feel they are of such a nature as to require that the brief be stricken or that sanctions be imposed. Mr. Jarman was successful in obtaining the relief he prayed for; namely, he was awarded a separation based upon his wife's cruel treatment. The trial judge specifically found Mrs. Jarman failed to prove infidelity on the part of Mr. Jarman. Obviously the references complained of were harmless and had no bearing on the outcome of this case. Accordingly, we deny Mr. Jarman's *448 motion to strike and prayer for sanctions. Mr. Jarman's alternative prayer that a Rule Nisi issue herein is likewise denied.
After a thorough review and evaluation of the record, we are convinced the evidence supports the reasons assigned by the trial judge. Except for our addition of an award of $500.00 monthly, cash, as alimony pendente lite to Mrs. Jarman, we affirm, adopting those reasons as our own, and attach a copy hereto. Said monthly amount shall be due from the date of the filing of this suit. Costs of this appeal are taxed equally to appellant, Kathleen Dowty Jarman, and appellee, George William Jarman.
AFFIRMED IN PART, AMENDED IN PART, AND AFFIRMED AS AMENDED.

APPENDIX

The Family Court

Parish of East Baton Rouge

State of Louisiana

Civil Numbers 77,285 C, 77,296 C

REASONS FOR JUDGMENT
On November 4, 1986, Kathleen Dowty Jarman, hereinafter referred to as Kathleen, filed for a legal separation against G. William Jarman, hereinafter referred to as Bill.
Kathleen alleged cruelty. She alleged generally that Bill changed work habits, that the marital relationship changed, that Bill failed to help her with a birthday party, began a health program, allowed a female to visit the marital home, got upset on a drive from Florida, refused to allow Kathleen to accompany him on a Houston trip, allowed a female employee to work with him on the Houston trip, told a marriage counsellor he was not committed to the marriage, left the marital home on August 9, 1986, told her that he had no reason for leaving, and has refused to return. Kathleen further alleges that on November 2, 1986, Bill threw her to the ground after verbal abuse. Kathleen further claims that Bill has engaged in conduct designed to psychologically harm her.
On April 20, 1987, Bill answered the petition denying Kathleen's allegations and alleging cruelty on Kathleen's part. No reconventional demand was filed.
A second suit was filed November 4, 1986, by Bill against Kathleen seeking a legal separation for Bill based on Kathleen's cruelty. On May 12, 1987, Kathleen answered Bill's petition.
On April 20, 1987, Bill amended his lawsuit to specifically allege Kathleen's cruelty as physically attacking him, throwing a gift at him, refusing sexual relations, screaming at him, telling him she sees no reason for the marriage, instigating arguments, ordering him out of the house, knocking off his glasses and dating other men.
On May 12, 1987, Kathleen answered the amending petition.
Each party seeks other relief. The cases were consolidated and tried on May 28, 1987 and May 29, 1987. Stipulations dispose of all issues except:
Is Bill guilty of cruelty and/or abandonment?
Is Kathleen guilty of cruelty?
What, if any, temporary alimony and/or child support should be awarded?
THE CASE
After fifteen years of marriage, Kathleen had given birth to two children. She and Bill had attained a comfortable life style. In 1984, however, after the birth of their second child, Kathleen became ill. The illness required a serious operation. She remains physically debilitated as a result of her condition from which she will not fully recover.
Kathleen testified that until the fall of 1985, her relationship with Bill was "fine" and that she "thought it was a good marriage". Bill and Kathleen did things as a family, Bill included Kathleen in activities with his clients, and Kathleen occasionally travelled with Bill.
Kathleen and Bill were dealing with her illness and enjoying a good life while Bill remained in a very successful law practice.
*449 Kathleen testified that in the fall of 1985, her relationship with Bill deteriorated. Bill's attitude toward their home changed he neglected house maintenance, took on more work with a Houston client, travelled more to Houston, was not present at home, and Bill's time for the children diminished. Kathleen claims Bill became irritable with her, impatient, aloof and resentful of her. Kathleen testified that she did not suspect Bill was doing anything wrong in Houston at the time.
Kathleen's direct testimony deals with 19 events:
(These events are discussed later in this opinion under corresponding numbers.)
1. A February, 1986 birthday party for their son. Bill had agreed to help with the party but came home too late after being with their daughter at her swimming activity.
2. April, 1986, changes in Bill's concern about his appearance. He lost weight, went on a diet, suntanned, jogged in their pool, and discussed turning 40.
3. At the Assembly Debutante Party, Bill responded affirmatively when Cynthia Hill commented on how cute Tracy Enos was. (No date given)
4. A confrontation on May 1 or May 2, 1986 at Kathleen's father's camp, Bill verbally attacked her in the presence of Barbara Guglielmo when Kathleen questioned their economic future.
5. Mothers Day, 1986. After Bill gave her a beautiful nightgown, Kathleen felt ignored all day because Bill didn't converse with her. She cried when Bill went upstairs to watch a movie with their son after ignoring her on the return drive from Lafayette.
6. Bill did not manipulate her hip to ease her pain as frequently at the end of May or June, 1986.
7. Bill suggested Tracy Enos babysit for them because Tracy Enos was and did move within 2 blocks of the Jarmans. (No date given)
8. After Bill informed Kathleen that he may be working intensly at the Legislature in June, 1986, Kathleen went to Florida for a week. Bill flew over in mid-week and informed Kathleen that Tracy had taken him to the airport in Baton Rouge. On the return trip, when Kathleen suggested that Bill missed a turn, Bill responded sharply, "Don't you think I know where to turn". Three weeks after this incident Kathleen told Bill that Nancy Crawford told her that while Kathleen was in Florida, Bill invited Tracy Enos into their home. Kathleen claims Bill admitted this but gave no explanation.
9. Bill changed jogging habits after Tracy Enos moved near their home. He left the pool and jogged on the street in the late afternoon, rather than at noon or in the morning and for 60 to 75 minutes rather than 35.
10. On Monday, June 10, 1986, Bill left for Houston. Kathleen can't recall his response when she questioned Bill as to why Bill didn't encourage her to go to Houston with him. At 10:30 a.m., Bill called from Houston, cried, told Kathleen he was sorry for not getting along, and realized he might lose his wife and children. At 7:00 p.m., Kathleen spoke to Bill at his hotel in Houston. At 9:00 p.m., Nancy Crawford told Kathleen that Tracy Enos went to Houston to work on a case with Bill. At 9:30 p.m., Kathleen called Bill and asked him if Tracy Enos was "there". Bill said, "Yes". When Kathleen asked Bill where Tracy Enos was staying he said "Here", and where did they work, he said "Here", in the room? yes, "it has a desk". Kathleen said she was "devastated", and "wild". Upon Bill's return on Thursday, June 11, 1986, he told Kathleen that he had met an attorney who discussed his own divorce misfortune and felt the "Lord" had put the attorney "in his path".
*450 11. From the Houston trip to August 9, 1986, the discussion at home centered around Bill not loving Kathleen and whether Bill should stay or leave. On June 22, 1986, Bill said he did not love Kathleen and resented her illness. From that time, the couple slept in the same bed without touching.
12. Bill told a counsellor he was not committed to the marriage. (No date given)
13. July 12, 1986, Bill said, "I have to go back to being a full-time father, and take responsibility for family again." Things "flip-flopped" then between Bill wanting to leave and his being a family man.
14. The first week of August 1986, Bill refused to wear his wedding ring.
15. August 7, 1986, Bill told Kathleen that he hadn't tried hard enough, and as much as he wanted to hate her, he recalled how she took care of him when he was ill.
16. August 8, 1986, Bill wore his ring to the office. Kathleen went to Lafayette. At 7:00 p.m., she called Bill who was hostile and said he planned to leave.
17. August 9, 1986, Bill left.
18. Sunday, August 10, 1986, Bill told the children that when Kathleen appeared to recover from surgery, he "saw a chance to get off the hook".
19. March 1987, Tracy Enos moved into Bill's former apartment across a courtyard from where Bill resided.
Cross examination dealt with several of the above stated events.
9. Kathleen objected to Bill increasing his jogging time because he was away from home so much
10. Kathleen informed Bill that if he left, she may move to Dallas and he may lose her and the children. In the Houston telephone conversation (which probably occurred Tuesday, June 10, 1986, not June 9, 1986), Bill did not say that Tracy Enos had a separate room. Kathleen called back 2 or 3 times, but did not accuse Bill of having an affair with Tracy Enos. Kathleen was upset because Bill had "concealed" "that" from her"that" meaning Tracy Enos and her presence in Houston.
11. Kathleen shook Bill and beat on his arms because he had not left a light on for her return.
15. Kathleen may have hit Bill and knocked off his glasses.
16. When Kathleen went to Lafayette, she left Bill a book as a present and a letter she described as "an expression of what was in my heart that morning". She believed the letter to be true.
Kathleen's letter, introduced as H-1, is apologetic, and lists good points of Bill and his character. It speaks for itself.
Finding Bill a good husband and father in 1985, she relates how from January through May 1986, he spent an average of 3 days and nights in Houston working on a case for Transco Pipeline.
From June 10, 1986 to August 9, 1986, arguments occurred only because Bill was saying he did not love Kathleen and she was trying to figure it all out. Bill would stare at her with hatred, and ask her when would she accept the fact that he didn't love her.
Jennifer Jarman, their young daughter, testified about Mother's Day 1986, the June 1986 Florida trip, Bill's jogging, Tracy Enos possibly babysitting, Bill's time in Houston, and the July 12, 1986 incident.
Jennifer said toward the end of 1985, family activities began to decline.
She overheard Bill tell Kathleen that he did not love her and asked her when was she going to realize that fact.
Beginning about two months before Bill left, and about five days after the June 1986, Houston trip, Bill and Kathleen argued one or two times per week. She heard Bill say he didn't love Kathleen or that he would try harder. She has witnessed each parent become physical with the other.
*451 The testimony of Tracy Enos was brief; but her deposition was introduced as Wife-11. She was Bill's paralegal; she was also assigned to several other attorneys. No detailing of her testimony is required. Although her testimony includes many replies of not recalling or knowing, nothing in her testimony or in the record is in direct substantial conflict with the testimony of Bill.
Mary McCowan and Mr. and Mrs. Guglielmo add little of substance by their testimony.
Bill was cross examined by Kathleen's counsel before testifying on direct.
He claims that for 3 months, he and Kathleen argued almost constantly. Each told the other that he or she no longer loved the other. When questioned under cross about the events significant in Kathleen's testimony, Bill testified as follows:
7. Tracy Enos moved two blocks from the home before June 4, 1986; Bill told Kathleen only to add Tracy Enos to a list of babysitters because he discovered she babysat for others.
8. Usually Bill is busy in the Legislature in June for a client and is late at times. When Bill asked Tracy Enos to give him a ride to the airport so he could go to Florida to meet Kathleen, she picked him up at home. He probably invited her in to see the house.
9. Bill intensified jogging in summer of 1986 as he did in every summer for ten years. (Kathleen testified Bill jogged for five years). The change to late afternoon was because of longer daylight.
10. Bill went to Houston on Monday, June 9, 1986 to work on Transco business. Tracy Enos arrived Tuesday bringing files and documents on another case. They worked in his room and Tracy Enos left the next day. His testimony does not conflict with that of Tracy Enos on any material points. Kathleen telephoned Bill at 9:00 p.m. Tracy Enos was not in his room. Kathleen called every 30 minutes until 1:30 a.m. She was very upset and accused Bill of "screwing a paralegal".
19. Bill moved to La Belle Fontaine apartments in October, 1986. He changed apartments and Tracy Enos and her brother moved into his former apartment. Bill and Tracy Enos have had more contact since that time, but have not gone out socially.
On direct examination, Bill testified concerning events related in Kathleen's testimony:
1. Bill got home late because Jennifer was ill. Kathleen screamed at him.
5. Kathleen accused Bill of not doing anything together; she threw the Mothers Day gift across the bedroom wherein Bill and their son were watching a movie.
15. August 7, 1986, Bill and Kathleen argued about his travel and money; she tried to strike him.
16. August 8, 1986, Kathleen called Bill from Lafayette after he read her letter (H-1). Bill suggested a 30 day trial separation; Kathleen refused and said that if Bill was leaving he should take his things and leave.
On direct Bill further testified that from January through August 9, 1986, he and Kathleen argued frequently over long standing complaints about his travel, his work, lack of money, his time away from home, and his being with their children more than with Kathleen.
Bill spent 3-4 days per week in Houston taking depositions.
Kathleen would complain about Bill not earning enough, yet complain that he was working too much; about his not spending enough time with the children, then about not spending enough time with her.
Bill testified that following the Houston trip of June 9, 1986 to June 11, 1986, Kathleen brought the "affair" into the arguments. She accused him of having an affair *452 with Tracy Enos and of allowing Tracy Enos into their house.
Bill testified that Kathleen became obsessed with Tracy Enos to the point that the last 4 weeks before August 9, 1986, chaos reigned in the house. Fighting began daily. He left to avoid that situation which included tirades and screaming. He did not want to chance losing control.
On August 10, 1986, he stated, in explanation of his departure, that when he realized Kathleen's illness was in remission, he had a chance to get out of the marriage, but that was not the sole reason for leaving, nor was it the entire conversation given.
Finally, on rebuttal, Kathleen testified that chaos reigned from June to August 1986. She said she was upset. The conversations were about, as she put it on the stand, that he took a woman to Houston and a woman had been in her home and Bill had not told her.
She denies hitting Bill on August 7, 1986, and telling him he was "screwin" a woman on June 10, 1986. She says she told Bill, "I'm not accusing you".
APPLICABLE LAW
Fault is a factual determination. If a spouse's actions, as a whole, destroy the objects of marriage, eroding mutual harmony, that conduct supports a finding of fault rendering the marriage insupportable. Cruse v. Cruse 498 So.2d 1153 (La.App. 3rd Cir.1986), and citations therein.
The trial judge must decide if the objective factual conduct alleged to be cruelty occurred; and then decide, largely subjectively, as to whether that conduct rendered living together unsupportable. Durand v. Willis 470 So.2d 947 (La.App. 3rd Cir.1985); Cruse v. Cruse 498 So.2d 1153 (La.App. 3rd Cir.1986).
Fault is unjustifiable conduct which so grievously wounds the mental feelings, or such as in any manner utterly destroys the legitimate ends and objects of matrimony. Guin v. Guin 378 So.2d 1022 (La.App. 2nd Cir.1979).
A justifiable or natural response to initial fault is not fault. Adler v. Adler 239 So.2d 494 (La.App. 4th Cir.1979 [1970]); Vail v. Vail 390 So.2d 978 (La.App. 2nd Cir.1980).
To prove abandonment, a party must prove a withdrawal from the matrimonial domicile without lawful cause and a constant refusal to return. Van [Von] Bechman v. Van [Von] Bechman, 386 So.2d 910 (La.1980).
Lawful cause arises only from acts sufficient to constitute legal fault under Article 138(3) of the Civil Code. Durand v. Durand [Willis], cited supra.
ANALYSIS
The preponderance of the evidence establishes that prior to the fall of 1985, the parties were reasonably happily married and enjoying what is commonly called "the good life", even considering Kathleen's health.
Bill, a successful litigation attorney, began an increase in his work and began to travel more on firm business. This resulted in a decrease in home time and family involvement. As happens in many relationships, such a change and increase in work and absence from home may cause some conflict. It is to be expected and dealt with by marriage partners.
The birthday party incident, seemed to stand out in Kathleen's mind as a benchmark in her tale. Bill's testimony provides a reasonable explanation of the incident.
The next item significant to Kathleen was Bill's change in his personal concern for appearance, weight, and fitness. However, he jogged for ten years and there is nothing unusual about concern for health at the end of decades of life, particularly at age 40.
The first time the hint of suspicion creeps into Kathleen's mind must have been at the Assembly Debutante Party when Bill merely agreed with a third party's assessment of Tracy Enos as cute.
The early May 1986 verbal spat at the camp is no more than just thata spat of insignificant proportions for which Bill explained and apologized; he had misunderstood Kathleen's statement.
*453 Mothers Day 1986, indicates that Kathleen began to become concerned over Bill's relationship with her. But did a husband who gave his wife an admittedly beautiful nightgown deserve a purely subjective charge of ignoring her to the extent that later in the day she should confront him and throw the present across the room wherein he was spending time with their young son. We think not.
Maybe Bill did not attend to her physical disability as frequently at the end of May or June, 1986. That may be a matter of degree for he did in fact continue to help her.
What, in and of itself, was improper with suggesting Tracy Enos as a potential babysitter.
Apparently Kathleen questioned Bill's need to spend a great amount of time at the Legislature in June 1986. But note that he joined Kathleen in mid-week. That doesn't square with a husband who is having an affair with his paralegal. But after being told that Tracy Enos took Bill to the airport, it is apparent that Kathleen became very suspicious of Bill's relationship. At this point, she had no valid reason to be suspicious; not even if he was sharp with her in the car.
The suspicion obviously increased when a third party told her that Tracy Enos had been in her house. Bill did not deny this to Kathleen. The first thing Kathleen established in court was the beauty and uniqueness of her home.
Tracy Enos moved near Bill's house. There is absolutely no evidence of a plan, scheme, or collusion between Bill and Tracy Enos on this point. It would be stretching the imagination to believe that a husband who has daily extended contact with his paralegal away from home would extend his jogging to see her at a house two blocks from his own; a house wherein she had a roommate. However, Kathleen was stretching her imagination.
Kathleen implies that Bill's not encouraging her to go to Houston with him in June 1986 was suspicious. However, she did not go on all trips. Maybe he had an explanation; she could not recall it however.
The morning conversation Bill and Kathleen had indicates that the parties were in fact beginning to verbalize their conflicts.
Kathleen's later call to Bill after she was told that Tracy Enos went to Houston also is apparently the first time her suspicions surfaced and entered into the marriage relationship. Her reaction is significant. She made much over his reply, apparently interpreting "Here" to mean "with me". Kathleen could not accept that Tracy Enos was working in Bill's room. Kathleen said she was "devastated" and "wild". She repeatedly called Bill until early morning.
This episode demonstrates the bloom of the bud of suspicion of romance between Bill and Tracy Enos. This bloom produced the fruit of destruction of this marital relationship. From then on, the disputes and confrontations centered on Bill's relationship with Tracy Enos.
Maybe Bill realized that the Houston incident could precipitate a divorce if it grew to a major point of contention. But certainly, his story of the discussion with the attorney who had himself the misfortune of divorce was not a confession.
Apparently, between June 10, 1986, and August 9, 1986, the confrontations worsened to the point that Bill began to tell Kathleen that he no longer loved her. Could she have begun killing that love with suspicion.
If love began to die, it died slowly. At times it may have revived. Bill would express an intent to remain as head of his family household and then would resign himself to the idea of separation. This is evidenced by a period during which he took off his wedding band, but replaced it.
Certainly as of August 7, 1986, Bill was frustrated. Things were said which no doubt hurt both parties. The next day, Bill must have decided to leave.
It must be noted that on that very day, Kathleen chose to give Bill a present. Did this evidence sorrow on her part for chaos she felt she caused or was it an attempt to win back a straying husband. Taken with the letter, it is more reasonable to conclude *454 that Kathleen was attempting to express her sorrow for causing the situation. No reading of the letter can lead to the conclusion that Kathleen was a justifiably outraged, wounded spouse. Her explanation of the meaning of the letter is not reasonably acceptable.
Bill's attempt to explain the situation to the children cannot be taken out of context. By then, the damage had been done.
Nor can we place full reliance on Jennifer's testimony. Recall that she was spying on her parents, not openly present during the discussions. Nor was she present for entire discussions.
Kathleen's suspicion grew even more when Tracy Enos moved into Bill's apartment complex. The explanation of that scenario is acceptable.
A most important note is the fact that nothing in the record proves that anything improper occurred between Tracy Enos and Bill. Bill has denied any sexual intercourse or sex with any one other than Kathleen. There is no direct evidence, no material conflicts in testimony; no amount of vague answers or inability to recall can be bundled into a case of proof. If one argues that the circumstances can be held as proof, another can answer that the circumstantial evidence does not exclude every reasonable hypothesis of innocence. Even Kathleen's witness, Joy Vandaveer, Bill's secretary, assured Kathleen that she knew of nothing improper. Contact between professionals of the opposite sex is today the norm. It cannot, without more, be employed as proof of infidelity.
Finally, Kathleen on rebuttal did testify that from June to August, 1986, chaos reigned in the house, that she was upset, and that the conversations were about Bill taking a woman to Houston and allowing a woman in her home.
CONCLUSION
From a reasonable view of the preponderance of the evidence in this case, the court must conclude that Kathleen's actions in provoking a state of chaos in the house for at least two months prior to Bill's leaving, destroyed the objects of marriage, eroded mutual harmony, grievously wounded her husband's feelings toward her, and rendered their living together insupportable. Her conduct therefore constitutes legal fault in accord with the definitions as stated above from cited cases. Bill testified that Kathleen actually accused him of infidelity, and Kathleen testified that she told Bill "I'm not accusing you". However, the evidence leads the court to conclude that Kathleen did, in fact, accuse Bill of infidelity. Even if the accusation was explicit only on one occasion, it was implicit in her confrontations from that time on. Why else did Kathleen testify that from June to August, 1986, their conversations were about Bill's taking a woman to Houston, and allowing a woman into her home.
Kathleen's actions were more grievous than those of Mrs. Adams, Adams v. Adams 389 So.2d 381 (La.1980), but at least as grievous as Mrs. Cruse's, Cruse v. Cruse 498 So.2d 1153 (La.App. 3rd Cir. 1986), but not so grievous as Mrs. Dooley's, Dooley v. Dooley 378 [478] So.2d 564 (La. App. 2nd Cir.1985), writ denied 480 So.2d 741 (La.1986).
The issues are resolved as follows:
Bill is not guilty of cruelty or abandonment.
Kathleen is guilty of cruelty.
TEMPORARY ALIMONY AND CHILD SUPPORT
The children and Kathleen are entitled to live in the standard to which they are accustomed. That standard has been high.
For the fiscal year ending in June, 1986, Bill grossed $173,000.00. From July, 1986, through April, 1987, Bill averaged a gross of $17,000.00 per month. Projected for 19861987, his gross should be in excess of $200,000.00.
Bill's law firm is doing well. He has a substantial partnership interest.
His claimed net income after taxes has been in excess of $10,000.00 per month. Deductions have included $1200.00 per month for retirement, $267.00 per month for insurance, and $1000.00 per month to an escrow account.
*455 He has been paying all community bills and giving Kathleen $1500.00 per month.
It has been stipulated that Kathleen will be awarded exclusive use of the marital home; Bill will pay all tuition, book expenses, testing and school registration fees for the children including any direct billings from the school. He will also maintain presently existing medical insurance on Kathleen and the children.
Except for alternate weekends, major holidays, and two summer weeks, the children will reside in Kathleen's residence.
From Bill's testimony we learn that after paying all expenses and debts claimed, he has a surplus of $830.00 per month.
Kathleen did not present a detailed affidavit of living expenses. However, her testimony does establish a high living standard and Bill's affidavit establishes the family's basic living expenses.
It is true that, as Kathleen testified, in one month, February 1986, $13,309.00 in checks were written. But obviously that month is not typical. For instance, the court does not accept as typical a clothing-cosmetic expense of $2747.00 per month. Also, that total includes community debts.
If the court deducts from Bill's net of $10,233.00 per month all of his claimed actual living expenses listed below: (numbers correspond to Exhibit Husband 2 where possible)

 1. Rent $385.00
 2. Food $300.00
 3. Household supplies $ 25.00
 5. Transportation $600.00
 6. Medical $ 25.00
 7. Dental $ 5.00
 8. Utilities $110.00
 9. Laundry $100.00
10. Personal and Grooming $ 20.00
11. Insurance car (for 1 car) $ 90.00
and deduct:
 E. Fixed debts
 home mortgages $3662.00
 All other debts $1750.00
and
13. Bluesteel Partnership
 debt $1135.00
we have $2026.00
remaining of his net income.

In addition to net income of $10,233.00, Bill has available the $1000.00 escrow and $1200.00 deducted for retirement, both deducted from gross.
Therefore, Bill has the ability to pay his living expenses, the home mortgages, all fixed debts, and have $2026.00 left each month.
The difficulty in arriving at a fair award is enhanced by the stipulations.
However, by ordering Bill to pay the house notes, representing both mortgages, Kathleen's exclusive use of the house is protected.
By ordering Bill to pay to Kathleen an additional $2000.00 per month, she should be able to pay other living expenses for herself and the children. This is a bit in excess of what Bill has been doing voluntarily.
The stipulated payment of medical insurance for Kathleen and the children causes no additional burden because that expense was deducted from the gross to arrive at the net.
The school expenses stipulated should also not overburden Bill at this time because the escrow and retirement sums were deducted from the gross to arrive at the net.
In summary, the court shall award temporary alimony and child support as follows:
Temporary alimony:
Bill shall pay and keep current the home mortgage notes totalling $3662.00; he shall also maintain Kathleen on the presently existing medical insurance, file necessary claims, and pay the proceeds on her medical expenses which shall included all medical expenses made necessary by illness or accident including prescription drugs.
Child support:
Bill shall maintain both children on the presently existing medical insurance, file necessary claims, and pay the proceeds on their medical expenses which shall include all medical expenses made necessary by illness or accident including prescription drugs.
*456 Bill shall pay for both children all tuition, book expenses, testing, and school registration fees including any direct billing from the school.
Bill shall pay the sum of $2000.00 per month in equal installments on the 1st and 15th days of each month commencing June 1, 1987. This award is not made retroactive because Bill has provided for his family at least until time of trial. The payments falling due between June 1, 1987 and the rendition of this judgment shall be subject to a credit for any cash paid to Kathleen after June 1, 1987. The balance due, if any, shall be paid within 90 days of rendition of this judgment.
Deposition costs are taxed as court costs.
Court costs are equally divided between the parties.
Judgment shall also be rendered including the stipulations dictated into the record at trial.
Judgment shall be rendered and signed accordingly.
Counsel shall submit a judgment signed by each approving as to form and content for the court's rendition and signing.
Baton Rouge, Louisiana this 7th day of July, 1987.
 /s/ Anthony J. Graphia
 JUDGE, THE FAMILY COURT